# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | | |
|---|---|---|
| **SHERRY CLARK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CASE NO.: 2:13CV83** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Sherry Clark seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance under Title II of the Social Security Act. 42 U.S.C. §§ 401-434. She alleges several errors, including a claim that the administrative law judge ("ALJ") erroneously concluded that Clark was able to do her past relevant work, and that the ALJ improperly determined her residual functional capacity ("RFC"). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I.  PROCEDURAL BACKGROUND

Clark filed an application for disability insurance benefits ("DIB"), alleging disability beginning December 4, 2004,[1] due to arthritis, lower back pain, carpal tunnel, severe allergies "to dozens of things," and a cataract in her right eye. (R. 10, 57). The Commissioner denied her application initially (R. 68), and upon reconsideration. (R. 76-78). Clark requested an

---

[1] This date was amended at the hearing to Clark's 50th birthday, December 16, 2010. (R. 10, 30, 100).

administrative hearing (R. 83-84), which was conducted on August 4, 2011.  (R. 25).

An ALJ concluded that Clark was not disabled within the meaning of the Social Security Act and denied her claim for disability benefits. (R. 10-20).  The Appeals Council denied review of the ALJ's decision (R. 1-6), thereby making the ALJ's decision the final decision of the Commissioner.  Pursuant to 42 U.S.C. § 405(g), on February 13, 2013, Clark filed this action seeking judicial review of the Commissioner's final decision.  (ECF No. 1).  This case is now before the Court to resolve the parties' cross-motions for summary judgment.  (ECF Nos. 9, 11).

## II.   FACTUAL BACKGROUND

Born December 16, 1960, Clark testified that she is a 5'3", 158-pound female with a high school education.  (R. 29).   In the fifteen years prior to her alleged onset of disability, Clark worked as a cashier and greeter.  (R. 169).  She was last employed in October of 2008 as a greeter with Wal-Mart, and was fired from that position "for working on [her] lunch break."  (R. 143).  In the years since, Clark has not worked.  (R. 169).

Plaintiff began seeking treatment for alleged neck, shoulder, and knee pain as early as 2006.  (R. 265).  In April 2008, Clark visited with Dr. Reeta M. Arora for an evaluation of her neck and shoulder pain.  (R. 265).  Dr. Arora considered Clark to be a "thin, pleasant lady in no acute distress."  Id.  She had good muscle tone and strength throughout, but had a somewhat limited range of motion in her shoulder due to pain.  Additionally, she had a mild spasm in her bilateral trapezius and cervical paraspinals.  Id.  Dr. Arora increased her dosage of Celebrex to 100mg bid for one month, decided to proceed with trigger point injections, and issued Clark two doctor's notes for work – one for the day of the appointment and one for the day following.  Id.

Clark's records indicate that her next visit occurred on December 1, 2008.  (R. 263). Abby J. Fuoto, A-NP on behalf of Dr. Mark Kerner, examined Clark.  She found Clark to be "in

a moderate amount of distress at rest" with "multiple tender points along her left trapezius radiating from her neck down into her infrascapular area." Id. She also had "tenderness over her bilateral L5-S1 joints," but was able to stand on her tip toes and "duck walk." Id. Her sensation was intact and she had a positive straight leg raise on the right side. Id. Due to a suspicion that she had a disc tear or herniation, however, an MRI of her lumbar was ordered. (R. 264).

Following the MRI, Clark followed up with Dr. Theresa G. Jackson on January 6, 2009. (R. 261). At that point, Clark reported her pain as being a 10/10. Id. The MRI was "remarkable for a broad based disc bulge at the L5-S1 area with foraminal stenosis, right greater than left . . . [and] a disc extrusion at the L4-5 area with mild central stenosis with possible contact of the right L5 nerve root." Id. Dr. Jackson concluded that Clark had multilevel herniated discs and prescribed Neurontin and Hydrocodone. Clark was to return following an EMG nerve conduction study of her lower right extremity for further assessment. Id.

That follow-up occurred on January 21, 2009. (R. 259). Dr. Jackson determined that the EMG was negative for any radiculopathy. Clark denied any numbness, tingling, loss of balance or bowel or bladder, and declined any sort of physical therapy or surgery. Id. Dr. Jackson noted that Clark had a herniated disc with foraminal stenosis, as well as a central to right paracentral disc herniation at the L4-5 level with potential contact of the right L5 nerve root, and also that she declined offers of injections and any type of surgical intervention, despite being counseled about the potential for worsening symptoms. Id.

Plaintiff visited Dr. Jackson again on April 7, 2010, asking that a disability form be completed. (R. 255). During the ensuing physical examination, Dr. Jackson noted that Clark had a decreased range of motion of her cervical spine in all planes, "pain with palpation," and that "[s]he has very exquisitely tender and tight trapezius muscles as well as supra and

3

infrascapular muscles." Id. Clark indicated that she also was suffering from carpal tunnel symptoms, but Dr. Jackson observed that no EMG nerve conduction study had been done for a number of years to verify this. Id. Additionally, Dr. Jackson stated that Clark had multilevel degenerative changes in her cervical spine and recommended an EMG nerve conduction study of her upper extremities to help assess the nature of her carpal tunnel. Id.

That EMG was subsequently completed, and on December 16, 2010 (Clark's amended date of onset), Dr. Mark Kerner of the Virginia Orthopedic and Spine Specialists noted that it demonstrated Clark did have carpal tunnel syndrome. (R. 253). While Clark considered there to be a mild decrease in her hand's dexterity, she rated her pain at 3/10. Id. During the same visit, Dr. Kerner observed that Clark had an antalgic range of motion of her cervical spine, a normal tandem gait, normal reflexes, and no sensory deficit. Id. He believed Clark had cervical stenosis with "a sense of some myleopathic symptoms . . . ." Id. Clark continued to refuse any surgical treatment, and she requested no further intervention. Id.

In November of 2010, Clark visited Dr. Alireza Jamali for the first time in three years, complaining of pain and discomfort in her lower back and extremities. (R. 334). Upon examination, Dr. Jamali found no spinal deformity, though did note that the range of motion of her lumbosacral complex was limited. Id. Clark also had localized tenderness on the right trochanteric bursa, sacroiliac joint, and piriformis[2] area. Id. Dr. Jamali ultimately diagnosed Clark with a lumbar sprain, right sacroiliitis, right trochanteric bursitis, and piriformis syndrome.[3] A Medrol Dosepak was recommended, and a follow-up was scheduled. Id.

_____

[2] The piriformis muscle is located in the hip. "One end . . . is attached to the sacrum and nearby structures. The sacrum is the lower end of the spine, filling in the gap between the back ends of the hip bones. The other end of the muscle . . . is attached to the greater trochanter of the femur . . . . Contraction of the muscle turns the thigh, and the leg, laterally." Vol. 4 – M-PQ, J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine (Matthew Bender) (2010).
[3] "A condition in which the piriformis muscle exerts pressure on the sciatic nerve, eliciting pain, tingling, weakness of muscles of the lower limb, etc." Vol. 4 – M-PQ, J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine (Matthew Bender) (2010).

The Dosepak failed to improve her symptoms initially, and on November 30, 2010, Clark received steroid injections on the right trochanteric bursa and piriformis tendon. (R. 333). She returned to Dr. Jamali on December 28, 2010, following an incident in which she claimed her back became "locked and severely painful" while walking her dogs. (R. 332). Dr. Jamali diagnosed her with acute lumbar sprain and right piriformis syndrome, and again recommended a Medrol Dosepak, as well as Flexeril. Id.

This time, Clark "responded quite well to the administration of [the] Medrol Dosepak in her December office visit." (R. 331). At a March 9, 2011 follow-up, she reported her pain as being a 2-3/10 and "manageable." Id. She had full range of motion in her hips along with some localized tenderness in her lumbar spine. Id.

She returned to Dr. Jamali's office on March 22, 2011 with complaints of neck pain. (R. 330). Dr. Jamali determined that she had a restricted range of motion of the cervical spine, multiple trigger points on "the insertion and origin of the musculature," but a normal neurological examination of her upper extremities. She was diagnosed with spinal stenosis and an MRI was recommended. Id. The MRI, conducted on April 6, 2011 (R. 327-28), showed a mild degree of spinal stenosis and several bulging disks. (R. 329). Consequently, Dr. Jamali updated Clark's diagnosis to cervical spondylosis and herniated disk, and recommended a neurosurgery consultation. Id.

At the consultation on May 5, 2011, Plaintiff met with Dr. Fatehi of Atlantic Neurosurgical Services. (R. 335-41). Dr. Fatehi conducted an examination of Clark, and reviewed those findings, along with the rest of Clark's medical history, with her. Dr. Fatehi explained that Clark was experiencing "mild age-appropriate degenerative changes with no frank disc herniations or significant spinal canal stenosis." (R. 337). Dr. Fatehi noted that Clark's

most troublesome area was her left shoulder joint, but left it to Dr. Jamali's discretion as to whether she would benefit from a steroid injection. Lastly, Dr. Fatehi agreed with Dr. Jamali's determination that Clark "is capable of being on a full time, light duty work status." Id.

The consultative evaluation performed by Dr. Seth Tuwiner was conducted a year earlier, on May 23, 2010. (R. 270). Dr. Tuwiner reviewed all of Clark's medical records and determined that Clark was capable of doing all activities of daily living, though she did need help washing her hair from her husband due to an inability to abduct or forward flex her arms. (R. 272). At the examination, Dr. Tuwiner considered Clark to be well hydrated and nourished with an "[a]nxious affect." Id. Her cervical, dorsolumbar, bilateral hip, knee, ankle, shoulder, elbow, wrist, and finger and thumb joint ranges of motion were all normal. (R. 273). Dr. Tuwiner determined Clark could stand and walk for four hours in an eight-hour day, needs no assistive device, and has no limitation when sitting. (R. 274). She did have frequent postural limitations, however, and could only lift fifteen pounds occasionally and seven pounds frequently. Id.

In June of 2010, State agency consultant Dr. William Amos reviewed the medical evidence. (R. 47-55). In determining Clark's residual functional capacity, Dr. Amos noted that she had exertional limitations. Specifically, Dr. Amos believed Clark could occasionally lift or carry twenty-five pounds, frequently lift or carry ten pounds, stand and/or walk for six hours out of an eight-hour day, and sit for more than six hours in an eight-hour day. (R. 51-52). She had no postural, manipulative, visual, communicative, or environmental limitations according to Dr. Amos' review. Id.

Given these results, Plaintiff was unable to perform her past relevant work as cashier or greeter as actually performed.[4] (R. 53). Despite what Clark's personal requirements may have

---

[4] Dr. Amos indicated that how Clark actually performed the work is unclear, though she stated that she lifted up to thirty-five pounds. (R. 53).

6

been at her job, because that position in the national economy is generally performed at the light exertional level, Dr. Amos determined that Clark did have the RFC to perform this work as it is normally performed. (R. 53-54). Hence, she did not qualify for disability benefits. (R. 54).

This decision was affirmed on reconsideration by Dr. J. Astruc on October 6, 2010. (R. 66-67). Dr. Astruc did note, however, that Clark could only occasionally lift or carry twenty pounds (as opposed to the twenty-five suggested by Dr. Amos), and did have moderate postural limitations due to arthritic pain in her arms, knees, and back. (R. 63). Additionally, Dr. Astruc determined she also had moderate environmental limitations, specifically regarding concentrated fumes and particulate matter. (R. 64). Both Drs. Amos and Astruc recognized that Dr. Tuwiner's opinion was more restrictive than their findings, but explained that discrepancy by Dr. Tuwiner's reliance on the subjective symptoms provided by Clark, rendering that opinion "less persuasive." (R. 53, 65).

In addition to the medical evidence, Clark testified that she is unable to perform full-time employment because of severe pain located primarily in her lower back (radiating to her leg) and between her shoulder blades. (R. 31). Due to that pain, she stated she is hardly able to function at home. Id. She testified that on a scale of zero to ten with ten being "such excruciating pain you need an emergency vehicle to take you to the emergency room," her pain consistently rates at a ten. (R. 32).

On a typical day, Clark testified that she attempts to care for her two dogs and complete household chores. Because of her constant pain and inability to remain standing or seated for extended periods, however, she indicated that these activities are often handled by her daughter because they would take Clark an inordinate amount of time to complete otherwise. (R. 34). She did report regular driving approximately three days a week to a local grocery store. (R. 30-

7

31). Additionally, Clark testified that she is not a member of any clubs or organizations, she is unable to read because of the pain in her neck, and she has been forced to refrain from her past crochet hobby. (R. 34-35).

Finally, the ALJ also heard from Barbara Byers, a vocational expert ("VE"). (R. 41-43). The VE described Clark's prior employment as a door greeter and cashier as unskilled work, requiring light physical demand. (R. 41). The VE testified, in response to hypothetical limitations framed by the ALJ,[5] that while Clark could not perform her past work, she could perform the jobs of agricultural produce sorter, ticket taker, and rental clerk – all light, unskilled work. (R. 41-42).

### III.    STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility

---

[5] The ALJ asked the VE to assume a person of the same age, education, and background as Clark capable of lifting, carrying, pushing, or pulling up to ten pounds occasionally, with no overhead exertion. (R. 41). Additionally, this individual could sit for six hours during an eight-hour work day, could stand and walk for four hours, but could not walk or sit for more than fifteen minutes without having to switch positions. Lastly, this person would need to avoid frequent turning of her neck and "repetitive fine and gross manipulation and reaching." Id.

determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.    ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The

Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.   The ALJ's Decision

In this case, after first finding that Clark last met the insured status requirements of the Social Security Act on December 31, 2013, the ALJ made the following findings under the five part analysis: (1) Clark did not engage in substantial gainful activity during the period from her alleged onset date of December 16, 2010, through her date last insured; (2) Clark had severe impairments of disorders of the back, arthritis, and carpal tunnel syndrome; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; and (4) Clark had the RFC to perform light work with specified limitations to avoid overhead reaching and pulling. She could stand or walk up to four hours within an eight-hour day for no more than ten-to-fifteen minutes at a time before sitting, and she could sit for six hours within an eight-hour day for no more than fifteen-to-thirty minutes before standing. Additionally, she must avoid turning her neck frequently, as well as constant and repetitive manipulation and reaching. Finally, the ALJ concluded that Clark could perform her past relevant work as a greeter and cashier as it is generally performed in the national economy, and in the alternative, that there are other jobs that exist in significant numbers in the national economy that Clark could also perform. (R. 18-19).

In her motion for summary judgment, Clark argues three errors by the ALJ which she asserts require remand. First, she claims the ALJ mistakenly concluded that the VE indicated Clark could do her past relevant work when she did not. Second, Clark alleges that the ALJ's RFC finding did not incorporate the appropriate limitations from all of Clark's severe impairments. Lastly, Clark claims the ALJ erred in not finding Clark's asthma to be a "severe" medical impairment. Each argument is considered in turn below.

### 1.   The ALJ's mistaken determination that Clark could perform her past relevant work is harmless error.

Plaintiff's first contention is that the ALJ erroneously construed the VE's testimony and

concluded that Clark could perform her past work as greeter and checker, when in fact the VE testified that she could not. This, Clark argues, constituted harmful error and "the case should never have been denied at Step 4." (ECF No. 10 at 9). After reviewing the relevant portions of the record, the undersigned finds that because the ALJ proceeded with his analysis to step five, determining that there were other jobs in the national economy which Clark could perform, any error at step 4 was harmless.

As Clark alleges, it does appear that the ALJ mischaracterized or misunderstood the VE's hearing testimony. The dialog between them was as follows:

> ALJ: I ask you to assume a hypothetical individual with [Clark's] age, education, and work background. Assume further this individual can lift, carry, push, pull up to ten pounds occasionally, but has to avoid overhead lifting, carrying, pushing, pulling, and reaching; can sit six hours within an eight-hour workday, stand and walk up to four hours within an eight-hour workday, but can stand and walk no more than 10 to 15 minutes at a time before alternating to sitting, and can sit no more than 15 to 30 minutes before having to stand; avoid frequent turning of the neck; avoid constant and repetitive fine and gross manipulation and reaching. Could such an individual perform [Clark's] past work?
> VE: No, sir.
> ALJ: Could the greeter job or checker job be performed with a sit/stand option?
> VE: Yes, it could be with a sit/stand option.
> ALJ: With those limitations –
> VE: No, sir.
> ALJ: -- that I gave you?
> VE: No, sir.
> ALJ: Okay.
> VE: No, sir.
> ALJ: But she testified that they would not let her sit. But has it been your experience that a greeter could either sit or stand?
> VE: Yes, sir.

(R. 41-42). Hence, the VE repeatedly indicated that Clark – or rather, a hypothetical individual suffering from the same sort of limitations as Clark – could not perform her past work. Id. In his opinion, however, the ALJ stated that "[t]he vocational expert . . . testified that the residual functional capacity established by the [ALJ] did not preclude performance of greeter-checker as

the work is usually performed in the national economy . . . ." (R. 18).  While the VE did testify

that a greeter could sit or stand, as the job is performed in the national economy, she still did not

endorse this job for a person with the limitations provided by the ALJ.  The medical reviewer,

Dr. Amos, specifically opined that Clark could perform the work of a greeter, but the ALJ did

not specifically rely on this finding.  As a result, it is not clear that the ALJ's finding on past

relevant work is supported by substantial evidence.

Notwithstanding this discrepancy, the ALJ made an "alternative" finding that there are

other jobs in the national economy that Clark could also perform.  Id.  Recognizing that Clark's

ability to perform a full range of light work "has been impeded by additional limitations," the

ALJ asked the VE to take into account those limitations in determining whether or not Clark

could perform other jobs.  (R. 19).  In response, the VE testified, in light of Clark's limitations,

that she was able to perform the jobs of agricultural produce sorter, ticket taker, and rental clerk.

Id.  Because the ALJ's alternate finding satisfies step 5's requirements, the apparent

misunderstanding of the VE's testimony regarding Clark's ability to perform her past work was

harmless error.

### 2.   The ALJ properly evaluated the evidence bearing on Clark's RFC.

Clark next contends that the ALJ erred in determining her RFC, which is defined as the

plaintiff's maximum ability to work despite her impairments.  20 C.F.R. § 404.1545(a)(1); see

SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to

perform sustained work on a regular and continuing basis.").  When a plaintiff's impairments do

not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must

then determine the plaintiff's RFC.  20 C.F.R. § 404.1520(e).  After doing so, the ALJ uses that

RFC at step four of the sequential analysis to determine whether the plaintiff can perform his

past relevant work.  Id. at § 404.1545(a)(5)(i).  If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy.  Id. at 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC.  Id. at § 1546(c).  RFC is determined by considering all the relevant medical and other evidence[6] in the record.  Id. at §§ 404.1545(a)(3) and 404.1527(b).  Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources."  SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.).  In this case, the ALJ found that Clark has the RFC to perform light work with specified limitations.  (R. 15-18).

In making his decision, the ALJ gave great weight to the consultative findings by Dr. Tuwiner, whose examination was conducted in May of 2010.  (ECF No. 10 at 9).  In so doing, Clark contends, the ALJ improperly discounted the deterioration that occurred after Dr. Tuwiner made his report.  Although she has not identified any specific medical record which contradicts the ALJ's findings, she asserts generally that "[t]he Commissioner should agree that there is definite medical worsening beginning in November of 2011[7]" and there is a question as to "whether the ALJ properly took that subsequent medical evidence into account when he accorded great weight to the May 2010 consultative examiner opinion . . . ."  Id. at 10.

As stated previously, the ALJ alone has the responsibility of determining RFC.  In doing

---

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).
[7] It appears from her allegations that Clark meant this date to be November 2010 – not 2011. See ECF No. 10 at 9.

14

so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[8]

Here, the ALJ found, after "careful consideration of the entire record," that Plaintiff is capable of performing light work with additional detailed limitations to account for her disabling condition. (R. 12, 15). In making the RFC determination, the ALJ provided a lengthy review of

---

[8] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

Plaintiff's treatment record including prior treatments for asthma, cataracts, and shortness of breath, as well as records from 2006-2010 relating to her neck and back pain from the Spine Center, records from Dr. Jamali's treatment in 2010 and 2011, Dr. Fatehi's 2011 neurological records, Dr. Tuwiner's May 2010 consultative evaluation, and State agency Dr. Amos' June 2010 opinion. (R. 15-17). Importantly, none of her providers ever opined that Clark's condition was completely disabling or that it would preclude full time employment. In fact, and as the ALJ noted, in May of 2011, neuro-surgeon, Dr. Fatehi determined that Clark's MRI-results were indicative of "age-appropriate degenerative changes with no frank disc herniations or significant spinal canal stenosis," and agreed with orthopedic surgeon, Dr. Jamali, that Clark is capable of being on a full time, light duty work status." (R. 17, 337).

Thus, Clark's contention that the ALJ did not properly consider her medical records following Dr. Tuwiner's examination is without merit. While it is true that the ALJ gave Dr. Tuwiner's opinion "significant weight," it was "based on clinical findings and is consistent and well supported by the evidence as a whole, including that from treating and examining sources." (R. 17). In fact, the ALJ's opinion clearly considers the opinions of Clark's treating physicians – before and after Dr. Tuwiner's May 2010 examination. (R. 16-18). It also bears mention that both Dr. Amos and Dr. Astruc, who reviewed the file after Dr. Tuwiner, concluded that Clark was less restricted by her impairments, yet the ALJ gave greater weight to Dr. Tuwiner's findings. Moreover, before reaching a final determination, the ALJ also considered Clark's own testimony, finding it "less than fully credible regarding the allegation that she is unable to perform any type of work as of her amended alleged onset date of disability – December 16, 2010." (R. 17-18).

Because Plaintiff has not indicated – and the Court's own review has not disclosed – any

other opinion evidence from a treating or examining physician that suggests she suffered from any greater impairment than what the ALJ noted, substantial evidence supports the ALJ's RFC determination, and the undersigned therefore recommends this claim be dismissed.

### 3. The ALJ did not err in not finding Plaintiff's asthma a "severe" impairment.

Finally, Clark argues that the ALJ erred in finding her alleged asthma was not a "severe" impairment. She alleges her medical records support a diagnosis of moderate to severe asthma. Additionally, she observes that Case Reviewer, Dr. J. Astruc, accounted for environmental limitations when determining her RFC in October of 2010. (ECF No. 10 at 10, R. 62-64). Specifically, she was to avoid concentrated exposure of "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 64). Accordingly, Clark contends, the ALJ's failure to find that her asthmatic condition was severe and impacted her ability to work was error.

An impairment, or combination of impairments, is considered severe if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c). Likewise, an impairment or combination of impairments is not severe if it does not limit the claimant's ability to do basic work activities. 20 C.F.R. § 404.1421(a). The Social Security regulations define basic work activities as the abilities and aptitudes necessary to do most jobs including:

1.  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

2.  Capacities for seeing, hearing, and speaking;

3.  Understanding, carrying out, and remembering simple instructions;

4.  Use of judgment;

5.  Responding appropriately to supervision, co-workers and usual work situations; and

17

6.      Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

Here, the ALJ determined that Clark had severe impairments of "disorders of the back, arthritis, and carpal tunnel syndrome." (R. 12). He specifically observed that Clark had been treated for asthma, a condition which was reported as being stable. (R. 16). To be sure, Clark had been hospitalized on several occasions prior to her alleged onset date of disability for asthma-related conditions. (R. 219). On November 15, 2007, Dr. John R. Sweeney of the Asthma & Allergy Clinic outlined Clark's then-existing condition to Dr. Karen Smith, Clark's family physician. Id. At that time, he indicated that Plaintiff suffered from "moderate to severe asthma." (R. 220). By November of 2008, however, her condition had stabilized. (R. 207). Clark has not cited the Court to any subsequent medical record related to her asthma. Indeed, the bulk of her records do not reference asthma at all, instead covering the treatment regarding Clark's extensive musculoskeletal issues as outlined previously.

"If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965); 20 C.F.R. § 404.1530). Here, the record clearly indicates that while Clark suffers from asthma to some degree, it has stabilized through treatment. This finding is amply supported by her complete lack of medical records, or treatment related to the condition after the alleged onset date in December 2010, nor any since the November 2008 visit referenced above. Accordingly, the ALJ's evaluation of her asthma and his conclusion concerning its severity is supported by substantial evidence.

## V.    **RECOMMENDATION**

For the foregoing reasons, the Court recommends that the final decision of the

Commissioner be affirmed.

## VI.     REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.     A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

November 27, 2013